**SO ORDERED.**

**SIGNED this 7th day of December, 2011.**



Janice Miller Karlin
United States Bankruptcy Judge
_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Larry Eugene Davenport and | ) | Case No. 08-41213 |
| Freda Gail Davenport, | ) | |
| | ) | |
| Debtors. | ) | |

### Memorandum Opinion and Order Granting Trustee's
### Motion to Compel Turnover and Granting, in part, Trustee's
### Motion for Post Confirmation Amendment of Plan

This case requires me to determine how best to remedy a situation where Debtors rapidly spent a significant postconfirmation windfall, obtained without required court approval, before the Trustee could seeks its turnover for the benefit of creditors. I am presented with the Chapter 13 Trustee's Motion to Compel Debtors to Turnover Proceeds from Sale of Property[1] and his Motion for Post Confirmation

---

[1] Doc. 61.

Amendment of Plan.[2] I have jurisdiction to decide this matter,[3] and it is a core proceeding.[4]

I grant the motion for turnover and require Debtors to immediately turnover the remaining $15,000 to the Chapter 13 Trustee. I also grant the motion to amend the plan, postconfirmation, in part, to provide for the turnover of the $15,000 and to allow the Trustee to disburse the $15,000 to pay administrative expenses and unsecured claims.

## I.    Findings of Fact

Debtors filed their Chapter 13 bankruptcy petition in August 2008. Their Schedule A disclosed that Mrs. Davenport was the owner of a one-sixth interest in real estate located in Wyandotte County, Kansas. Debtors estimated the value of her interest at approximately $10,000. This value was based upon a 2002 county appraisal that valued the land at $50,900. Divided by six, Mrs. Davenport's interest was thus worth approximately $8,500 six years prior to filing of the bankruptcy. There is no evidence that the Davenports had any reason to believe the land was worth more than $50,900 when they filed bankruptcy.

---

[2] Doc. 74.

[3] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and 11 U.S.C. § 1334(a) and (b), and by operation of a Standing Order dated August 1, 1984, effective July 10, 1984, referenced in D. Kan. Rule 83.8.5, wherein the District Court for the District of Kansas referred all cases and proceedings in, under, or related to Title 11 to the District's bankruptcy judges.

[4] 28 U.S.C. § 157(b)(2)(E) and (L).

Debtors originally proposed to abandon to the trustee their interest in the real property "in order to satisfy the 'best interest of creditors test'" under 11 U.S.C. § 1325(a)(4).[5] Debtors discussed this abandonment with the Trustee at the initial meeting of creditors. Because he did not consider himself a "liquidating trustee," however, the Trustee informed them that he would not accept the transfer of the property, and liquidate it, for the benefit of creditors. The Trustee did, however, inform the Debtors that because the plan payments proposed by them (and required by Official Form B22C) were sufficient to satisfy the best interest of the creditors test without the sale of this property, there was no need to liquidate Mrs. Davenport's interest in the land. Debtors agreed to amend their plan to remove the "abandonment" language, and that plan was confirmed in December 2008 without objection.[6]

Two years later, in 2010, Mrs. Davenport and her siblings were contacted by the Kansas Department of Transportation ("KDOT") because KDOT intended to acquire the land for a highway project. In a letter dated November 2010, KDOT offered Mrs. Davenport and her siblings $776,895 for the land—more than 15 times the previously appraised value of the land. Although KDOT had the authority to use condemnation

---

[5] The "best interest of creditors test" is found in § 1325(a)(4), and requires debtors to provide at least as much money to general unsecured creditors as those creditors would have received under a liquidating Chapter 7 proceeding. All future statutory references are to the Bankruptcy Code as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101 - 1532 (2005), unless otherwise specifically noted.

[6] There were three objections to confirmation of the amended plan, but they all involved amounts required to be paid to secured creditors, and did not involve the best interest of the creditors test or the real estate. By agreement, Debtors agreed to pay $27,500 to CoreFirst on their mobile home, $13,262 to Toyota for a Toyota Tacoma, and $10,212.50 to Toyota on a Camry. These were the debts requiring most of the $1,560 plan payment.

3

proceedings to acquire the land, the evidence shows that Mrs. Davenport and her siblings simply agreed to sell the land to KDOT without requiring judicial action. KDOT eventually paid $797,495.00 for all the property; Mrs. Davenport received $132,915.83 as her one-sixth share in late December 2010; she then paid approximately $19,000 in taxes on that distribution, leaving her with about $113,000.

Mrs. Davenport did not seek Court approval to sell her 1/6 interest, and the Davenports did not disclose their receipt of the money to the Trustee. He learned of the sale upon a routine review of Debtors' 2010 tax returns. When the Debtors declined to return the money to the estate, the Trustee filed a motion for turnover of the funds and, in the alternative, a motion to modify the plan payments to require them to repay the funds over time through a plan.

At trial, Debtors testified that because they thought this was their money (as a result of the Trustee's decision not to require it be sold prior to plan confirmation), they had spent all but approximately $15,000 of the $113,000 they had received only eight months earlier. Debtors provided a very rough itemization of how some of those funds were spent, including:

| Expense | Amount Spent |
|---|---|
| 2008 Pontiac Torrent | $12,700 |
| Taxes on new vehicle | $1,375 |
| New tires and service on new vehicle | $800 |
| Garden shed | $4,200 |
| Fencing | $400 |

4

| | |
|---|---|
| Sleep Number Bed | $1,877 |
| Guttering | $620 |
| Trip to Hawaii | $3,500 |
| Mobile Home Repairs | $4,100 |
| Taxes on inheritance | $19,000 (approx.) |
| Washer and Dryer | $3,358 |
| Chapter 13 plan payments | $14,850 |
| John Deere installation of PTO | $1,416 |
| Furniture | $622 |
| **Total** | **$68,818** |

Debtors were unable to itemize how they spent the remaining $49,000, only noting that it had, in fact, been spent, and claiming that most had likely been used for miscellaneous items such as doctor bills, utilities, vehicle upkeep, entertainment, groceries, lot rent, mobile home payments, and car insurance.[7]

## II. Debtors' actions have been contrary to statute and orders, resulting in prejudice to their creditors.

The Trustee requested turnover of the entire amount Debtors received from KDOT, but in the alternative, requested Debtors repay that money over time, through an amended plan pursuant to § 1329, recognizing that they have managed to spend

---

[7] Debtors' Trial Exhibit 26. Mrs. Davenport testified she used $12,700 to buy a 2008 Pontiac (plus another $800 for tires and service for it) because she had many miles on her other car, which I assume was the 2004 Camry to which she had stipulated the value to be $10,212.50. There is nothing to reflect that plan payments are not still being paid on the Camry claim, so it appears these two Debtors may now have three vehicles—the Toyota Tacoma, the Camry and the Pontiac.

5

most of it. The Trustee notes that only $27,000 in unsecured claims were filed in this case.

### A.   The best interest of the creditors test must be re-evaluated upon the filing of a motion to amend the plan.

The starting point for any modification of a confirmed Chapter 13 plan is § 1329(a). That statute allows the trustee, after confirmation, but before plan completion, to seek modification of a plan to increase the amount of payments on claims, or to extend the time for such payments. Section 1329(b)(1) then specifically provides that "Sections 1322(a), 1322(b), and 1323(c) of this title and the requirements of section 1325(a) of this title apply to any modification under subsection (a) of this section."

One of the "requirements of section 1325(a)" is that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date."[8] Section 1329 makes it clear, and the parties do not contest, that the best interest of the creditors test must be met before any amended plan can be confirmed. The issue I must decide is whether the liquidation value of a debtor's estate should be measured as of the effective date of the initial plan, or whether the value should be measured as of the effective date of an amended plan to account for any changes in the value of the debtor's property.

---

[8] § 1325(a)(4).

6

This issue was recently addressed by Chief Judge Nugent in *In re Auernheimer*.[9] In *Auernheimer*, the debtors calculated their Chapter 13 bankruptcy estate's liquidation value at just under $15,000. Because the plan proposed to pay more than that to general unsecured creditors, the court confirmed the plan. A year later, the debtors moved to amend their plan, asserting that the liquidation value was drastically less than they had originally estimated. The loss in value was due to the fact that three accounts receivable held by the debtors—totaling $13,000—were essentially uncollectible and because other property had greatly diminished in value since confirmation of the original plan.

The debtors thus sought to "reestablish" the liquidation value of the estate and proposed to instead pay approximately $3,100 to general unsecured creditors. The Trustee objected, arguing that the value of the debtors' non-exempt assets was determined at plan confirmation and that the "'effective date' is, and always remains, the effective date of the original confirmed plan, not the modified plan. Recognizing a split of authority on the issue of the "effective date" of a plan modification for the purpose of confirming the plan under § 1329(b)(1), Judge Nugent adopted the majority position, which is that the effective date of the modified plan controls, not the original plan, when determining whether the best interest of the creditors test has been met.[10]

---

[9] 437 B.R. 405 (Bankr. D. Kan. 2010) (Nugent, C. J.).

[10] *Id.* at 409.

The seminal case for this majority approach is *In re Barbosa*,[11] which has similar, but significantly less egregious facts, than those before me. In *Barbosa*, the debtors owned investment property they originally valued at $64,000. Two years after confirmation, the debtors sold the property for $137,500. The trustee moved to modify the plan to increase the dividend paid to unsecured creditors. The court agreed with the trustee, noting that § 541(a)(6) would have made the profits from the sale of this property part of a Chapter 7 estate had the case been converted, and that the same result should apply in determining the hypothetical liquidation value of the estate.

The minority view on the "effective date" issue is lead by the Eighth Circuit Bankruptcy Appellate Panel's decision in *Forbes v. Forbes (In re Forbes).*[12] In *Forbes*, the court focused on language contained in § 1329(b)(2), which states that the plan as modified "becomes the plan." Under the *Forbes* approach, the plan "is a unitary constant that exists throughout the case and brings with it a constant effective date—that relating to the initially-confirmed plan."[13]

I agree with the *Barbosa/Auernheimer* approach. The purpose of § 1325(a)(4) is to ensure that creditors are not treated any worse in a Chapter 13 proceeding than they would be treated in a Chapter 7 liquidation. Section 1329 recognizes the importance of this requirement in any plan amendment by incorporating § 1325(a)(4),

---

[11] 236 B.R. 540 (Bankr. D. Mass. 1999).

[12] 215 B.R. 183 (8th Cir. BAP 1997).

[13] *In re Auernheimer*, 437 B.R. at 408 (citing *In re Forbes*, 215 B.R. at 183).

8

which requires that unsecured creditors should get as much in a Chapter 13 as they would get under a Chapter 7 liquidation. If this case were converted to a Chapter 7 proceeding, the property would be revalued, and any prepetition nonexempt property remaining in the hands of the Davenports would be subject to liquidation—including the proceeds from the sale of the land in question.[14] Because such a result would occur if the property were actually liquidated at this time, it is most logical to read § 1329 to require such a result in a hypothetical liquidation under the best interest of the creditors test.[15] And, as at least one court has noted, the legislative history of § 1329 shows that Congress intended just such a result.[16] I find that both the language and the legislative history of § 1329 support a holding that it is the effective date of the amended Chapter 13 plan that controls the calculation of the best interest of the creditors test, not the effective date of the original plan.

---

[14] *See* § 348(f)(1) (prepetition property held by debtors on date of conversion is property of the estate in a good-faith conversion from Chapter 13 to Chapter 7, and valuations of the property under Chapter 13 are not effective) and § 541(a)(6) (proceeds from the sale of property of the estate are also considered property of the estate).

[15] *See In re Nott,* 269 B.R. 250, 255 (Bankr. M.D. Fla. 2000) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 431 (1977) U.S.Code Cong. & Admin.News pp. 5787, 6386, 6387 when stating "[i]n applying the standards of proposed 11 U.S.C. § 1325(a)(4) to the confirmation of a modified plan, 'the plan' as used in the section will be the plan as modified under this section, by virtue of the incorporation by reference into this section of proposed 11 U.S.C. § 1323(b). Thus, the application of the liquidation value test must be redetermined at the time of the confirmation of the modified plan.")

[16] *Id.*

9

Admittedly, and as Judge Lundin notes in his Chapter 13 Bankruptcy treatise, numerous problems could arise under either interpretation of § 1329(b).[17] From a practical standpoint, a Trustee or creditor could seek an upward modification in payments every time an asset even minimally increases in value—or a debtor could likewise seek a downward modification in payments every time an asset decreases in value. I note, however, that those same concerns could be raised with numerous other common changes in a Chapter 13 debtor's financial situation, such as minor increases or decreases in income, adjustments to payments on variable interest loans, or changes in the amounts of normal monthly living expenses. Absent significant and generally unexpected changes in a debtor's income or expenses, modifications under § 1329 are seldom sought by trustees, debtors or creditors, nor should they be. I anticipate the same will hold true regarding increases or decreases in the value of non-exempt estate property. In any event, "the Court is bound by Congressional enactment"[18] and any potential issues that may arise under this interpretation will be decided if and when they arise.

### B.  The Trustee's motion for turnover will be granted, in part.

I have found that Debtors must account for the postconfirmation appreciation in the value of the KDOT real estate. Ordinarily, that would occur by the debtor seeking to modify his plan, in good faith, before spending the money, to account for the

---

[17] *See* Keith M. Lundin & William H. Brown, Chapter 13 Bankruptcy, 4th Edition, § 254.1, Sec. Rev. June 15, 2004, available at www.ch13online.com.

[18] *In re Auernheimer*, 437 B.R. at 409.

additional funds through a recalculation of the best interest of the creditors test. That recalculation would be based upon the value of the property as of the effective date of the amended plan.

That is not how the Davenports elected to proceed. They instead chose to spend money that was not theirs until they were caught, at which point they had spent all but $15,000.

The order confirming their amended Chapter 13 plan specifically ordered that all of the Davenport's property would re-vest in the Davenports, as their own property instead of property of the estate, only after completion of their plan and approval of the Trustee's Final Report and Accounting.[19] In addition, Debtors' own amended Chapter 13 plan, which resulted in that confirmation order, also clearly provided that "property of this bankruptcy estate includes all property acquired after the filing of the bankruptcy petition, including earnings."[20] The increase in the value of the land is such property acquired after filing.

The confirmation order also provides that the Davenports are "enjoined and prohibited from selling, encumbering, or in any manner disposing of assets without prior court order of the Court, except as required in the course of Debtor's business, if

---

[19] Order Confirming Plan (Doc. 39) at ¶ 13. *See also Vannordstrand v. Hamilton (In re Vannordstrand)*, 2007 WL 283076 (10th Cir. BAP Jan. 31, 2007) (holding that property inherited more than 180 days postpetition became property of the Chapter 13 estate, and had to be turned over, because the court's confirmation order delayed vesting of estate property back to the debtor until the entry of discharge).

[20] Amended Chapter 13 Plan (Doc. 25) at ¶ 21, entitled "Property of the Estate."

11

Debtor is engaged in business."[21] There is simply no doubt that Mrs. Davenport was barred from selling her 1/6 interest without court approval, and there is also no doubt that the Davenports were prohibited from spending the KDOT money without court approval, since they had not completed their plan and there had been no final report at the time of the sale or disposal of the funds. The money was not theirs to spend. Their protestations that they did not know this was not their money to spend are belied by the language contained in their own plans and in the confirmation order.

I also disagree with the Davenports' claim that because the State of Kansas approached them to purchase land as an initial step to a condemnation proceeding, they had no choice but to sell and were thus not required to obtain Court approval. First, the Davenports presented no evidence that the land ever went into condemnation proceedings. Instead, the evidence showed that the sale to KDOT was purely voluntary. Although KDOT could have commenced a condemnation proceeding had the Davenports declined to sell, it never got that far. Second, the Davenports' appropriate request for court approval of the sale would have given the Court, the Trustee, and all creditors not only the ability to ensure that the Davenports had negotiated a reasonable price for this estate asset, but also the ability to ensure that the proceeds of the sale were properly administered.

By failing to seek and obtain the required court approval, or to even affirmatively inform the court or the Trustee of the sale, the Davenports gave

---

[21] Order Confirming Plan (Doc. 39) ¶ 5.

12

themselves a 4-5 month head start that allowed them to spend nearly all of the proceeds before the Trustee learned of the sale through a routine review of tax returns.[22] Had the Davenports complied with their clear responsibilities, the Trustee would have been in a position to ensure that all the proceeds from the land sale were accounted for in the new best interest of the creditors analysis.

Instead, by the time the Trustee made this discovery and filed his motion, the Davenports had depleted almost $100,000 of estate assets.[23] In addition, even after the motion seeking turnover was filed in May 2011, Debtors elected to continue to spend the money they were now on very clear notice that the Trustee believed was not theirs to spend. And although the money was spent over a short period of time, Mrs. Davenport was a poor historian and record keeper of when (and how) all the money was spent. She admitted that even after the motion for turnover was filed, they spent over $4100 on repairs and $12,700 plus $800 on the new car, tires and service, but she could not remember what else they had purchased with the funds after May 2011. She did, however, admit that even more was spent after the Trustee filed the motion.

Based on the fact Debtors elected to go on a spending spree with money that was not theirs to spend, simply requiring Debtors to turnover the $15,000 remaining for a re-calculation of the best interest of the creditors test is insufficient to remedy the

---

[22] The Davenports received the settlement from her father's estate in December 2010 and the Trustee's motion for turnover was filed in May 2011.

[23] Debtors' Exhibit 26 indicated they had to pay $19,000 tax on money received, leaving approximately $113,000 as estate assets.

13

damage caused directly by the Davenports. Had they sought court approval of the sale, all of the net proceeds would have been available for that best interest of creditors analysis instead of merely $15,000. But the evidence shows the rest is gone, and ordering turnover of the full amount would be futile, since there is no evidence they have the ability to repay that full amount. Therefore, I will order the immediate turnover of the remaining $15,000 the Davenports testified they still had in their bank account, and which I directed them not to spend pending further order.[24] Although this turnover does not make the estate whole for the Davenports' actions, it will provide at least some relief to the unsecured creditors.[25]

### C. The Davenports' defenses are unpersuasive.

The Davenports filed a brief in opposition to the motions to compel turnover and to amend the Chapter 13 plan. In that brief, they attempted to distinguish *Auernheimer*, and also claimed that the Trustee should be estopped from attempting to collect the proceeds from the sale of the land under the principle of equitable estoppel.

First, the Davenports' attempt to distinguish *Auernheimer* is not persuasive. Rather than addressing, or even mentioning, the legal basis for the decision, the Davenports focus entirely on what they perceive to be procedural flaws unique to that

---

[24] This decision requiring turnover of the $15,000 remaining from the sale of the land is without prejudice to the Trustee seeking additional remedies in light of the evidence received at trial, or otherwise.

[25] In fact, it should result in more than a 50% dividend to those unsecured creditors that filed claims in this case.

14

case, ill-advised decisions by the debtors' counsel in that case, and the motives of that Chapter 13 trustee. Although I acknowledge that there are certainly factual differences between *Auernheimer* and this case, the legal analysis and holding in *Auernheimer* are squarely applicable here. In addition, *Auernheimer* relied extensively on the line of cases led by *In re Barbosa*, the facts of which are nearly indistinguishable from ours (minus the elements of bad faith that exist with the Davenports' actions).

Similarly, I find that the Davenports' contention that the Trustee should be equitably estopped from pursuing these funds is entirely without merit. First, this argument is based on the Trustee's alleged "abandonment" of the property at the first meeting of creditors. As the Trustee explained during his testimony, he did not abandon the property. Instead, he informed the Davenports that they could not abandon the property to him to liquidate and administer for the benefit of the creditors—as was provided in the Davenports' initial Chapter 13 plan—because he is not an operating trustee. The Trustee informed the Davenports that the amount they proposed to pay to unsecured creditors, as required by Form B22, was sufficient to satisfy the best interest of the creditors test given the value of the land at that time.[26] I find nothing improper about the information provided by the Trustee to the Davenports, and the Davenports elected to amend their plan instead of litigating that issue.

---

[26] The Amended B22C calculations (Doc. 47), filed on March 27, 2009, show that the Davenports' monthly disposable income available for general unsecured creditors was $196.41 per month, or $11,784.60 over the life of the 60 month plan.

15

Second, because equitable estoppel is based in a court's equitable powers, the doctrine of unclean hands is applicable. "The clean hands doctrine is based on the maxim that one who seeks equity must not himself be guilty of inequitable conduct."[27] As noted by the Kansas Supreme Court:

> "It should also be emphasized that in applying the clean hands maxim, courts are concerned primarily with their own integrity. The doctrine of unclean hands is derived from the unwillingness of a court to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge. It has nothing to do with the rights or liabilities of the parties. In applying the unclean hands doctrine, courts act for their own protection, and not as a matter of 'defense' to the defendant."[28]

I find the Davenports' decision to spend these estate assets, especially after the Trustee filed his motion for turnover, simply inexcusable.

When they filed this case, the Davenports reported their total liabilities to all creditors at approximately $92,500. Their net monthly income was $3,566.66 (approximately $42,800 per year), and they had monthly expenses of $2,247. In contrast, after deducting taxes, the Davenports received almost $114,000 from the land sale. That is equivalent to two and one-half year's income for these Debtors. They could have paid 100% of their claims, which totaled $89,596, and still emerged from under

---

[27] *Cox v. Countrywide Home Loans (In re Cox)*, 408 B.R. 407, 417 (Bankr. D. Kan. 2009) (citing *Fuqua v. Hanson*, 222 Kan. 653, 656-57 (1977)).

[28] *Id.* at 418 (quoting *Green v. Higgins*, 217 Kan. 217, 221 (1975)).

16

this Chapter 13 proceeding completely debt free (including their home and two or three cars), and still had $24,000 (or over six months of net income) remaining.[29]

But that was not how the Davenports elected to proceed. Instead, they took a vacation in Hawaii, purchased a newer vehicle, fixed up their home, built an expensive garden shed, bought new furniture and high-end appliances, and even used some of the proceeds to make their Chapter 13 plan payments and cover their monthly living expenses—begging the question what they did with their ordinary monthly income of at least $2,225.[30]

In approximately eleven months, the Davenports managed to spend almost $100,000 from the sale of the land, plus at least $24,475 from their ordinary earnings (not counting any amount earned by Mr. Davenport as a part time bus driver). The only effort they made to pay any of this windfall to their creditors was to make their required monthly Chapter 13 plan payments in a total amount of $14,850.

---

[29] They likely would have had significantly more than that, because the Trustee's Interim Report (Doc. 71) dated August 2, 2011 shows the Trustee has paid claims of $41,995.

[30] I understand that the Davenports' income has decreased somewhat since the filing of this case, but the evidence showed that Mrs. Davenport is still bringing home approximately $1,300 per month from her employment and Mr. Davenport is receiving $925 per month in SSI plus additional income from a driving a bus part time. Frankly, one would think in light of these financial problems, which they knew of when they made these spending decisions, the wiser course of action would have been to file a motion to use some of the windfall on anything they could demonstrate was necessary, and turn over the rest to the estate. It is hard to feel sorry for the situation the Debtors find themselves in, especially in light of their poor, voluntary choices.

17

To make matters worse, the Davenports did not inform the Court or the Trustee of the sale of this land or seek the required Court approval. This deprived the Trustee and creditors of the ability to capture more of the funds for the benefit of creditors.

The Davenports are, in no way, entitled to the Court's equity under these facts. Their contention that the Trustee's decision to not sell the land at the outset of this case should in some way prevent him from now seeking to claim the property for the bankruptcy estate is unpersuasive.

## III. Conclusion

Debtors, Larry and Freda Davenport, are like the children who have been caught eating the prohibited cookies from the family cookie jar. Although at the point they were caught they had eaten 90% of the cookies, they wish to eat the few that remain even though that will deprive the rest of the family of their share. This I will not, and cannot, allow.

**It is, therefore, by the Court ordered** that the Trustee's Motion to Compel Debtors to Turnover Proceeds from Sale of Property is granted in part. Debtors are ordered to forthwith turn over $15,000 to the Trustee. The rest of that motion is denied because $15,000 is the only portion of the proceeds that remain liquid, and the Trustee has not sought other relief regarding assets purchased with the remaining funds.

**It is further ordered** that the Trustee's Motion for Post Confirmation Amendment of Plan is denied, except for granting the request to amend the plan to require Debtors to immediately pay $15,000 to the Trustee for distribution to unsecured claims and administrative expenses.

18

# # #